## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BERDINA MOORE-BONDS,<br><br>Plaintiff,<br><br>v.<br><br>MORGAN STANLEY & CO. LLC,<br>MORGAN STANLEY SMITH BARNEY<br>LLC, AND MORGAN STANLEY,<br><br>Defendants. | Case No. 1:25-cv-01428<br><br>**Jury Trial Demanded** |

## COMPLAINT

Plaintiff Berdina Moore-Bonds, by and through her attorneys, Stowell & Friedman, Ltd., and Ben Crump Law, PLLC, hereby files this Complaint against Defendants Morgan Stanley & Co. LLC, Morgan Stanley Smith Barney LLC, and Morgan Stanley (collectively "Defendants," "Morgan Stanley" or "the Firm").

### JURISDICTION AND VENUE

1.      Plaintiff's claims arise under 42 U.S.C. § 1981, Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-1 et seq., and the Age Discrimination in Employment Act, and this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

2.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b). Defendants maintain their corporate headquarters and principal place of business in this District and some of the unlawful conduct alleged in this Complaint occurred in this District.

### PARTIES

3.      Defendant Morgan Stanley is a publicly traded, global financial services firm and Fortune 500 company incorporated in Delaware and headquartered in New York. As part of its wealth management business unit, Morgan Stanley employs more than 55,000 employees in the

United States, including approximately 16,000 financial advisors ("FAs").[1] Morgan Stanley is registered with the Securities and Exchange Commission as a broker-dealer and with the Commodity Futures Trading Commission as a futures commission merchant. In 2022, Morgan Stanley's wealth management business managed over $4 trillion in client assets, with revenues of $53.67 billion, and profits of $11 billion.[2]

4.      Plaintiff Berdina Moore-Bonds is African American and resides in Tampa, Florida. Moore-Bonds was employed by Morgan Stanley's predecessor and then by Morgan Stanley from 1987 until her unlawful termination in 2023.

**FACTUAL BACKGROUND**

**I.    Morgan Stanley's Legacy of Discrimination**

5.      Morgan Stanley has a long and ongoing history of systemic, intentional discrimination in its wealth management business unit, as documented in lawsuits and federal consent decrees spanning from the 1970s to today.

6.      Morgan Stanley has been the subject of actions by the Equal Employment Opportunity Commission ("EEOC") for systemic discrimination, and in individual and nationwide class action race and gender discrimination lawsuits for its treatment of minority and female professionals. Morgan Stanley has flouted federal consent decrees requiring it to provide equal opportunities.

7.      In the 1970s, the EEOC sued Morgan Stanley's predecessor, Dean Witter, for engaging in a class-wide pattern and practice of race and sex discrimination with respect to recruitment, hiring, assignment, training, promotion, and other terms and conditions of broker employment. *See EEOC v. Dean Witter & Co., Inc.*, No. 78-839 (E.D. Pa.). In 2001, the EEOC

[1] Morgan Stanley, Form 10-k at 7 (Feb. 24, 2023), available at https://www.morganstanley.com/content/dam/msdotcom/en/about-us-ir/shareholder/10k2022/10k1222.pdf.
[2] *Id.* at 73.

again sued Morgan Stanley on behalf of a class of female sales employees, alleging that Morgan Stanley did not fairly promote and compensate women, in violation of Title VII. Consent Judgment, *EEOC v. Morgan Stanley & Co.*, No. 01-cv-08421 (S.D.N.Y. July 13, 2004), ECF No. 236. Morgan Stanley settled the case in July 2004 for $54 million and promised reforms of its discriminatory practices.

8.      After decades with no meaningful progress, in June 2006, female Morgan Stanley wealth management employees challenged unequal pay and advancement practices and other discriminatory treatment in the class action sex discrimination lawsuit *Augst-Johnson v. Morgan Stanley & Co.*, No. 06-cv-1142 (D.D.C.). In April 2007, Morgan Stanley settled that case for $46 million and agreed to enact programmatic relief.

9.      Around the same time, a group of 14 current and former African American Morgan Stanley FAs from ten offices across the country notified Morgan Stanley of the pattern and practice of intentional race discrimination they had suffered at the Firm. Morgan Stanley pretended to negotiate meaningful policy reforms in good faith with this group of committed employees. In reality, however, the Firm secretly sought to end its liability on the cheap by negotiating to transform a dormant putative gender discrimination class action into a bargain race, color, and national origin class action settlement, *Jaffe v. Morgan Stanley & Co.*, No. 3:06-cv-03903 (N.D. Cal.). The only *Jaffe* class representative at the time did not attend the mediation, rejected the proposed settlement, and was then replaced by another African American former employee who received $125,000 to resolve her arguably time-barred individual claims. Latinos were added to the *Jaffe* settlement class without the presence or participation of a Latino class representative.

10.      In October 2007, Morgan Stanley announced it would settle the transformed *Jaffe* case for $16 million, to be distributed among a class of 1,300 African American and Latino

employees.[3] While the settlement was low, the magnitude of the discrimination underlying the *Jaffe* settlement was extreme. Evidence was presented to the *Jaffe* court by a labor economist who had studied years of Morgan Stanley's FA compensation and workforce data and found that African American FAs were "systematically disadvantaged by policies and practices at Morgan Stanley relating to compensation and other terms and conditions of employment." Klein Decl. at ¶¶ 3–8, *Jaffe* (Nov. 19, 2007), ECF No. 104. The labor economist found that Morgan Stanley hired African Americans less frequently than should be expected given the labor pool, and when it did hire African Americans, the Firm paid them less and they experienced higher turnover than white employees. *Id.* Over substantial opposition and after numerous hearings, the *Jaffe* court approved the low settlement, relying in part on the programmatic relief that the parties represented would improve opportunities for African American (and Latino) FAs.

11.     The fourteen African American former Morgan Stanley FAs mentioned above continued their pursuit of justice in their own race discrimination claims. In that suit, *Moore v. Morgan Stanley*, the plaintiffs amassed considerable evidence of the Firm's rampant race discrimination and hostile culture, and they defeated summary judgment. Morgan Stanley settled on the eve of trial. Minute Entry, No. 07-cv-05606 (N.D. Ill Mar. 10, 2009). As part of the *Moore* joinder lawsuit, Professor Phillip Atiba Goff, a renowned social science expert, reviewed the record and concluded, among other things, that the "employment policies and practices at Morgan Stanley are of the type likely to lead to racial bias, particularly given the under representation of Blacks and cultural aspects of the Firm." Expert Report of Phillip Goff at 5, *Moore* (Dec. 31, 2008), ECF No. 258-2.

---

[3] That the *Jaffe* settlement undervalued the claims was plain after the settlement, when a nearly identical class action lawsuit against Morgan Stanley's competitor Merrill Lynch was settled for $160 million, ten times the $16 million *Jaffe* settlement, for the same number of class members. *See* Settlement Agreement and Release at VIII.A, *McReynolds v. Merrill Lynch*, No. 05-cv-6583 (N.D. Ill. Aug. 28, 2013), ECF No. 585-1.

12.     Due to Morgan Stanley's hostility to African Americans, the lip-service reforms in the *Jaffe* settlement have failed, and, as intended, Morgan Stanley's discriminatory policies and practices continue in full force. Indeed, Morgan Stanley never complied with the programmatic relief to which it agreed in two nationwide class action settlements, the race and color *Jaffe* settlement or the sex discrimination *Augst-Johnson* settlement. Morgan Stanley's performance was so abysmal that it agreed to extend certain aspects of the programmatic relief and settlement agreements in the *Jaffe* and *Augst-Johnson* cases for an additional two years. Stipulation and Order to Extend Jaffe Settlement Agreement, *Jaffe* (Sept. 30, 2015), ECF No. 301; Order Approving Mot. to Extend Consolidated Settlement Agreement, *Augst-Johnson* (Apr. 7, 2016), ECF No. 79.

13.     In 2015, a group of African American employees challenged Morgan Stanley's ongoing pattern and practice of race discrimination against Black FAs and failures to adhere to its promises in the *Jaffe* settlement and consent decree. *See Frazier et al. v. Morgan Stanley*, No. 16-cv-0804 (S.D.N.Y.), ECF 109-1 (Proposed Fourth Amended Complaint). Rather than fix its rampant race discrimination, Morgan Stanley decided to put an end to public litigation of its employees' civil rights claims. To insulate itself from negative publicity and legal liability, Morgan Stanley covertly forced its employees to confidential, private arbitration in a forum it controls for all discrimination claims, denying victims of discrimination the right to go to court and have a public trial before a jury of their peers.

14.     Other wealth management managers and contractors witnessed and were subjected to Morgan Stanley's discriminatory practices. In June 2020, the former Global Head of Diversity and 26-year employee Marylin Booker sued the Firm for discrimination and retaliation after being fired for complaining about "the irrefutable and appalling patterns she saw regarding the hiring, retention, and lack of advancement of Black employees" and pushing for reforms to

improve the lives of Black employees. *Booker v. Morgan Stanley*, 20-cv-02662 (E.D.N.Y.), Dkt. 19 at ¶ 8–9. Booker alleged that the discriminatory culture at Morgan Stanley started at the very top of the Firm with CEO James Gorman, and that "[c]learly, black lives did not matter at Morgan Stanley." *Id.* at ¶ 10–12. Booker alleged that from 2012–2020, Morgan Stanley appointed 1,382 Managing Directors, of which, only 2.23% were African American, and there were only 4 Black Managing Directors in wealth management. *Id.* at ¶ 55–56, 129.

15.     Morgan Stanley settled Booker's lawsuit just days before its CEO James Gorman was set to testify in front of Congress. Booker later reiterated Morgan Stanley's utter failure to address its rampant race discrimination and implement *Jaffe's* programmatic relief.[4]

16.     Outside recruiter Anthony Fletcher recounted Morgan Stanley's systematic bias against both him and the Black candidates Morgan Stanley rejected or underpaid despite their stellar qualifications. *Fletcher v. Morgan Stanley*, 23-cv-2769 (N.D. Ill), Dkt. 37. Morgan Stanley contracted with Fletcher and his recruitment firm after a Regional Diversity Officer ("RDO") admitted the Firm could not source, recruit, or retain Black talent, including in the management ranks.

17.     As a recruiter, Fletcher interacted with high-ranking Morgan Stanley executives and hiring managers and witnessed Morgan Stanley's brazenly biased culture. Hiring managers relied on racial stereotypes and forced the few Black candidates hired into lower paying roles and jobs. A senior officer rejected the idea of recruiting Black managers because they would not be accepted by rank-and-file Morgan Stanley employees and would be "problematic" for the Firm. *Id.* at ¶ 39.

---

[4] Emily Flitter, *The White Wall: How Big Finance Bankrupts Black America* (pp. 209–10). Atria/One Signal Publishers. Kindle Edition (2022).

18.    Fletcher charges that he, too, was subjected to Morgan Stanley's discrimination being limited to diverse candidates and paid less and treated worse because of his race. ¶¶ 40, 50, 53. When Fletcher reported this discrimination to Morgan Stanley, it terminated his contract. ¶¶ 60–62.

19.    The decades of race discrimination lawsuits—spanning from the 1970s until today and brought by the EEOC, rank-and-file employees, upper-level executives, and outside contractors—lay bare Morgan Stanley's ongoing legacy of race discrimination to which Plaintiff Moore-Bonds was subjected.

**II.    Morgan Stanley Is Engaged in Systemic Race Discrimination Against African American Employees**

20.    Morgan Stanley, one of the nation's largest and most profitable financial institutions, has been engaged in an unbroken pattern of systematic race discrimination against African Americans, including in its management ranks, which the Firm views as the almost exclusive province of white managers.

21.    Though the Firm has promised to reform, Morgan Stanley remains rife with racism and institutional discrimination in the hiring, treatment, pay, and promotion of African American professionals in wealth management. The Firm maintains a strong and racially hostile corporate culture that favors white men and does not view African Americans as talented and capable professionals and leaders, but as outsiders to be used solely for public relations and marketing.

22.    Due to Morgan Stanley's deeply ingrained, harmful racial stereotypes and discriminatory employment practices, it relegates African Americans into lower paid and lower status roles than their talent and experience warrant, with limited advancement opportunities. In these roles, Black professionals are often denied resources, support, special project work, and credit for their many achievements and instead are marginalized and undermined. They are

subjected to different standards of performance, denied promotions, and many are targeted and driven from the Firm. Morgan Stanley's discriminatory practices include the disproportionate attrition and termination of Black professionals, including in reductions in force and reorganizations.

23.    Morgan Stanley's racial discrimination is maintained and reinforced by its racially biased corporate culture, which is laden with harmful stereotypes about African American employees and customers.

24.    Morgan Stanley's deeply rooted racial bias against African Americans is reflected in candid statements by Firm management and personnel across the country, for example:

- Following the murder of George Floyd, Head of Sales Jim McCarthy announced on a Firm-wide call that while Morgan Stanley was committed to increasing diversity, it would not "lower the bar" for Black applicants, who would instead have to "raise to the Morgan Stanley standard," or words to that effect. When a Black woman made a written complaint to Morgan Stanley senior leadership including the Head of Global Talent Development and the Head of Diversity and Inclusion, the Firm retaliated and eventually targeted her for termination.

- A regional Morgan Stanley officer admitted the Firm would not consider hiring a Black manager because it would be "problematic" and not accepted by white advisors.

- A hiring manager wanted a "diverse candidate" willing to laugh at his insensitive jokes and not look like they just came into the office from the club.

- A Morgan Stanley manager discouraged a Black FA from pursuing a Black multi-millionaire client because African Americans "don't understand finances, they just want to buy things" and lack "the intellect to invest."

- A racist picture of President Obama depicting him running toward a trap set with fried chicken circulated through a branch office, with the branch manager finding it hilarious. When a Black woman complained, she was dismissed as not having a sense of humor.

- A white FA told a Black FA he would not make it in the business because "Black people don't have money," or words to that effect.

- A manager told a Black FA, "some clients just don't want Black brokers," or words to that effect, and then took away her client and reassigned the client to a white FA.

- A high-ranking white FA argued the reason Morgan Stanley treated Black FAs worse is because this is "a white man's business," and Black FAs need to be able to "market to people they can relate to" (referring to Black clients).

- When a Black FA tried to team with a senior white FA, he said, "Why would I want to team with you? No one wants to team with people like you," meaning Black people.

- Another white FA told a Black FA: "Wealthy people want to work with people who look like them," meaning white, "Look around, do you see a lot of people who look like you?"

- A successful FA who was very close with management told a Black FA, "I don't know if this is the right business for you. A lot of people in this area are white and won't do business with you," or words to that effect.

- Racial slurs and hostile language abound in Morgan Stanley offices. For example, Firm employees referred to a Black FA as "Popolo," a Hawaiian racial slur akin to the N-word, in the presence of managers and without any repercussions.

- Morgan Stanley employees openly used racial stereotypes to describe African American FAs and clients, falsely accusing them of being "lazy" and "dishonest," and deeming African American clients or prospects disreputable and unworthy.

- African Americans were frequently and openly referred to as "the token Black," "the Black guy" or "the Black lady," rather than by their names.

- A senior Morgan Stanley executive repeatedly boasted in speeches that he talks to the "the African American help," meaning the janitors.

- A manager told the sole African American FA in an office that he had to watch her all the time and did not want her in his office, that he did not want to advertise on Black radio stations because it would paint the Firm in an unfavorable manner, and maligned her African American clients as not "credible or trustworthy" people.

- A white complex manager regularly referred to his African American colleague as "boy," without discipline or correction from the Firm.

- A white complex manager told a Black regional training officer that African Americans were inherently less capable of passing the Series 7 licensing and other examinations.

- Hiring managers told African American candidates that Black people had a hard time passing the psychological screening test.

25.     A former Senior Diversity Officer at Morgan Stanley similarly confirmed the

Firm's racially hostile culture and discrimination against African Americans. The Officer left

Morgan Stanley less than two years into her tenure, sending an impassioned letter explaining her reasons and pleading for change to the Firm's entrenched race discrimination and biased culture in wealth management and toward Black employees. The Officer lamented that "the very notion of equity for diverse advisors and managers is oftentimes met with arrogant disapproval." Ultimately, the Officer tried to convey to Morgan Stanley's senior leadership the experience she and so many African American employees face at Morgan Stanley:

> You cannot begin to imagine how it feels for a woman of color to be constantly reminded that neither your credentials, nor your title, nor your professional accolades, nor your expertise gleaned both from your professional and social experiences as a woman of color, are enough to counteract **the pervasive and systemic biases that run throughout this organization.**

26.    This well-documented toxic and racially hostile culture infects the Firm's policies and practices related to pay and advancement, work assignments, and termination and layoffs, among other things.

27.    Morgan Stanley stunts the careers of African American professionals by placing them into lesser and lower paying roles for which they are overqualified and undercompensated.

28.    Morgan Stanley also steers African Americans into positions that are in what it deems appropriate "urban" markets or into dead-end positions related to diversity. Often, these positions are under resourced, and these employees are set up to fail.

29.    Once in these roles, the Firm routinely denies resources to its African American employees, including mentorships and special projects or assignments that would allow them to advance their careers.

30.    The careers of African Americans are further stymied as Morgan Stanley denies African Americans advancement to management because of negative and false racial stereotypes about their leadership and abilities, and its belief that the Firm's mostly white workforce will not work for African American managers.

31.     The Firm also targets African Americans for termination, including through reorganizations and reductions in force ("RIFs"), while manipulating jobs and criteria to save the jobs and careers of less qualified white employees and managers. In some instances, Morgan Stanley shifts Black employees to positions it knows to be redundant or unnecessary to have that position and employee later eliminated in a reorganization or RIF. On the contrary, the Firm houses white employees in positions it knows will not be eliminated regardless of the employees' qualifications in order to provide them with a safe harbor from a reorganization or RIF.

32.     As a result of Morgan Staney's discriminatory practices, African Americans are dramatically underrepresented in wealth management. To illustrate, in 2021, African Americans were almost entirely excluded from the Morgan Stanley field management ranks and financial advisory workforce:

- None (0) of the 7 Regional Directors were African American, nor have any African Americans ever served as Divisional Directors[5]

- Only 6 of the 88 Complex Managers were African American

- Only 15 of 380 Branch Managers were African American

- Fewer than 1% of Morgan Stanley's approximately 16,000 financial advisors were African American[6]

- None (0) of Morgan Stanley's wealth management senior business executives were Black

33.     And since 2021, Morgan Stanley has made well over 35 field leadership appointments, with approximately only five appointments being African American. During this same time, nearly ten African American leaders were terminated or forced to leave the Firm.

---

[5] In approximately January 2023, Morgan Stanley reduced the number of Regional Directors from 7 to 4. All of the Regional Directors remainrf white.
[6] *Booker v. Morgan Stanley*, No. 20-cv-2662 (E.D.N.Y. Jan. 14, 2021), ECF 1 at ¶ 126.

**III.    Morgan Stanley's Unlawful Conduct Harmed Berdina Moore-Bonds**

34.    Plaintiff Berdina Moore-Bond's experiences at Morgan Stanley are pursuant to and consistent with the Firm's decades-long pattern of systemic race discrimination against African Americans. Throughout her employment, and pursuant to its pattern and practice of race discrimination and discriminatory employment practices, Morgan Stanley denied Moore-Bonds resources, support, mentoring, job assignments, advancement opportunities, promotions, and compensation because of her race and otherwise treated her worse than similarly situated employees who are not African American.

35.    In approximately August 1987, Moore-Bonds began working at Morgan Stanley's predecessor, Dean Witter, as a marketing assistant. Moore-Bonds was well qualified to succeed, armed with a Bachelor's Degree of Science in Business Education from the University of Arkansas and a Master's Degree in Public Administration.

36.    Over the years, Moore-Bonds worked tirelessly and at a very high level for Morgan Stanley. As a result, she received positive feedback on her excellent performance and took on increased responsibilities and roles. Moore-Bonds discovered a passion in the training and development of key employees. In approximately 1997, she became a Field Trainer, working with the Morgan Stanley financial advisors and branch managers who drove the wealth management business to teach them the Firm's products, technology, and services, to grow their businesses and better service Morgan Stanley's clients. She worked hard in her job and to increase her own skill set to advance her career. Moore-Bonds became a Certified Professional in Training Management, received an ATD Coaching Certificate, completed the Morgan Stanley Leadership Readiness program, and successfully completed the McKinsey Leadership Academy.

37.    Despite her talent, hard work, and excellent performance, Moore-Bonds, like other African Americans at Morgan Stanley, was subjected to and harmed by Morgan Stanley's

discriminatory policies and practices. Morgan Stanley regularly denied Moore-Bonds job assignments and promotions it regularly provided to non-Black employees. For example, after Morgan Stanley's merger with Smith Barney, Morgan Stanley elevated a slate of trainers to managers, all of whom were white, and all of whom had significantly less tenure, experience, and knowledge than Moore-Bonds. The only other Black trainer, a Black man, was also denied a promotion although he, too, had more experience and outperformed the elevated white managers. This experience of being passed over because of her race continued, as Moore-Bonds watched Morgan Stanley give lesser qualified, younger, and non-Black trainers increased titles, pay, and opportunities that she was denied.

38.     After being repeatedly stymied, Moore-Bonds sought to move out of her training role to seek advancement elsewhere at Morgan Stanley. She applied for a Project Manager role for which she was well-qualified in the Firm's design and development business unit. However, the white hiring manager met with Moore-Bonds and told her not to apply for the Project Manager role and instead forced her to apply for a non-manager Instructional Design position. Desperate to try another path for advancement, Moore-Bonds relented and applied to the non-management role. Moore-Bonds performed the Instructional Design role well for six months , but Morgan Stanley refused to formally hire her into the job she had been doing.

39.     Morgan Stanley gave both the Project Manager and Instructional Design positions for which it rejected Moore-Bonds to non-Black candidates. After being denied for both roles, Moore-Bonds filed a charge of discrimination with the Equal Employment Opportunity Commission. Rather than gain managerial opportunities, Moore-Bonds suffered retaliation for her protected complaint.

40.     Over 30 years after she started at the Firm, Morgan Stanley finally promoted Moore-Bonds to the management position warranted by her excellent performance. In 2021,

Moore-Bonds was hired as a Training Manager over a team of virtual, remote trainers across the country. In this role, Moore-Bonds witnessed firsthand how the Firm discriminated against Black professionals, including in advance of and in its implementation of reductions in force ("RIFs"), in which Morgan Stanley worked to save the jobs and salvage the careers of white employees while targeting and terminating Black employees.

41.    Just one example of the Firm's discriminatory practices occurred when a white Executive Director-level employee was set to be terminated in a RIF under Firm guidelines. Rather than fire the white Executive Director, the National Training Manager, to whom Moore-Bonds reported, added the Executive Director as a new "field trainer" to Moore-Bonds' team. Morgan Stanley forced Moore-Bonds to hire the white Executive Director without an interview or input and ordered Moore-Bonds to give her "special projects," of which Moore-Bonds had none. The white Executive Director had little to no experience as a trainer, yet she continued to be compensated as an Executive Director. The Firm paid her far more than it paid Moore-Bonds, who was ostensibly her manager. After the RIF was concluded and employee terminations were completed, Morgan Stanley moved the white employee to a new role it created: Head of Training & Development, Integrated Service Solutions, where she continued to outearn and advance more than Bonds and other Black employees. Morgan Stanley did not similarly save Black employees from termination by placing them into jobs for which they were not qualified or needed.

42.    Moore-Bonds also regularly witnessed the Firm systemically discriminate against Black job candidates as well as employees. For example, in approximately 2022, Moore-Bonds became the Field Learning Manager ("FLM") for the Firm's Central Region. She also joined the Central Region's Diversity, Equity, and Inclusion committee, which was supposedly tasked with trying to address the Firm's historical and ongoing racial hiring disparities and barriers and increase the paucity of African Americans in Morgan Stanley's wealth management division,

especially in the FA ranks. The committee was led by a white Central Regional Director. Under this Director, the committee established a recruiting program for Historically Black Colleges and Universities ("HBCUs"), wherein committee members, including Moore-Bonds, would visit HBCUs and try to recruit talented and well-qualified Black students to join the Firm. However, it became apparent this scheme was only designed to create the appearance of fairness and that the Firm had no intention to hire Black HBCU students as FAs. Of the many talented and well-qualified Black students who participated in the HBCU recruitment program, Moore-Bonds is not aware of any Morgan Stanley hired as FAs.

43.    After years of watching Morgan Stanley force out and use reorganizations to target Black Morgan Stanley professionals, Moore-Bonds found herself subject to the same fate. Prior to 2023, Morgan Stanley organized its wealth management business into seven geographic regions: Central, Mid-Atlantic, New England, Pacific Coast, New York, Southeast, and Mid-America. Each region had an FLM, who in turn managed a team of trainers who worked with FAs and managers within the branch offices. In approximately 2023, Morgan Stanley implemented a re-organization, eliminating the Central, Mid-Atlantic, and New England regions and merging them into the remaining four. Of the seven FLMs, three were slated for termination, and two of those were African American women. And of the three slated for termination, Morgan Stanley only terminated the two Black women.

44.    Consistent with its pattern and practice of discrimination, Morgan Stanley protected and retained the younger, white male FLM initially slated for termination, but terminated the older Black female FLMs. When the Pacific Coast FLM whose position was not affected by the reorganization quit, Moore-Bonds was the best choice to assume the FLM position. Moore-Bonds had invaluable experience and the most knowledge of the territory and personnel. The new Pacific Coast region subsumed Moore-Bonds's former Central region,

meaning the Pacific Coast region included all of Moore-Bonds's former territory, branch offices, personnel, and trainers she managed. Considering Moore-Bonds's long tenure and record of outstanding performance, and her unique familiarity with the region, she was the obvious and most qualified candidate for the Pacific Coast FLM role.

45.     Moore-Bonds sought the job and asked to apply to the now-open FLM position, but Morgan Stanley refused to even consider her for the job. The Firm refused to permit her to submit an application or interview. When Moore-Bonds questioned her manager about the job, she learned she was rejected because the Firm "already had selected a candidate," or words to that effect. Morgan Stanley hand-picked the only white male FLM affected by the reorganization for the open FLM role without a competitive process and contrary to its internal policies and procedures. Moore-Bonds had over a decade more tenure and experience at the Firm than this younger white, male FLM, who (unlike Moore-Bonds) had no connection to the Pacific Coast region. To add insult to injury, shortly after terminating Moore-Bonds, Morgan Stanley promoted the four remaining FLMs to First Vice President, which included a large increase to their earnings.

46.     After Morgan Stanley denied Moore-Bonds the Pacific Coast FLM role because of her race, she applied to other positions at Morgan Stanley for which she was well qualified. Despite Moore-Bonds interviewing and receiving positive feedback for at least one role, Morgan Stanley rejected her. Instead, Morgan Stanley gave the job to a significantly younger white man with significantly less experience from outside the Firm for the role. Morgan Stanley rejected Moore-Bonds for every position for which she applied due to her race and in retaliation for her complaints.

47.     At the time of the reorganization, Morgan Stanley promised Moore-Bonds that she could remain at the Firm at least as a trainer and be permitted system access to search and apply for roles internally.

48.     In approximately March 2023, Moore-Bonds, following the Firm's direction in its termination letter, retained an attorney. Her counsel informed Morgan Stanley of Moore-Bond's good faith claims of race discrimination. Within days of this notification, Morgan Stanley further retaliated against Moore-Bonds and cut off all Morgan Stanley system access, which prevented communications with colleagues, coworkers, and hiring managers and denied her jobs and other employment opportunities.

49.     Morgan Stanley used "reorganizations," including the same RIF in which it fired Moore-Bonds and the other Black FLM, as a tool and pretext to eliminate other talented Black professionals and managers as well, while manipulating jobs and criteria to save the jobs and careers of less qualified white employees.

50.     Morgan Stanley's unlawful discrimination and retaliation caused Moore-Bonds to suffer significant financial losses and irreparably damaged Moore-Bond's career and substantial emotional distress and other non-pecuniary losses.

51.     Punitive damages are appropriate because Morgan Stanley's conduct was malicious and Morgan Stanley was recklessly and callously indifferent to the statutorily protected rights of Moore-Bonds.

## COUNT I

### RACE DISCRIMINATION IN VIOLATION
### OF 42 U.S.C. § 1981

52.     Plaintiff Moore-Bonds realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count I of this Complaint.

53.     42 U.S.C. § 1981 guarantees persons of all races the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

54.     By the acts and conduct described above, Morgan Stanley engaged in illegal intentional racial discrimination against Plaintiff in violation of 42 U.S.C. § 1981.

55.     Plaintiff has been harmed as a direct and proximate result of Morgan Stanley's unlawful conduct.

## COUNT II

### RETALIATION IN VIOLATION OF
### 42 U.S.C. § 1981

56.     Plaintiff Moore-Bonds realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

57.     Plaintiff Moore-Bonds alleges that she engaged in protected activity by complaining of her unlawful treatment and retaining an attorney.

58.     Plaintiff Moore-Bonds alleges that she suffered retaliation and harm because of her protected activity, in violation of 42 U.S.C. § 1981.

59.     Plaintiff has been harmed as a direct and proximate result of Morgan Stanley's unlawful conduct.

## COUNT III

### RACE DISCRIMINATION IN VIOLATION OF
### TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
### 42 U.S.C. § 2000e-1 *et seq.*

60.     Plaintiff Moore-Bonds realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count III of this Complaint.

61.     Plaintiff Moore-Bonds filed a charge of discrimination with the EEOC and has received a Notice of Right to Sue from the EEOC.

62.     Title VII of the Civil Rights Act of 1964 and amendments thereto make it an unlawful employment practice to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his or her compensation, terms, conditions, or privileges of employment, because of such individual's race; or to limit, segregate, or classify his or her employees or applicants for employment in any way that would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his or her status as an employee, because of such individual's race.

63.     By the acts and conduct described above, Morgan Stanley engaged in illegal race discrimination against Plaintiff in violation of Title VII, through both disparate treatment and disparate impact.

64.     Plaintiff has been harmed as a direct and proximate result of Morgan Stanley's unlawful conduct.

## COUNT IV

### SEX DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-1 *et seq.*

65.     Plaintiff Moore-Bonds realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count IV of this Complaint.

66.     Plaintiff Moore-Bonds filed a charge of discrimination with the EEOC and has received a Notice of Right to Sue from the EEOC.

67.     Title VII of the Civil Rights Act of 1964 and amendments thereto make it an unlawful employment practice to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his or her compensation, terms,

conditions, or privileges of employment, because of such individual's sex; or to limit, segregate, or classify his or her employees or applicants for employment in any way that would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his or her status as an employee, because of such individual's sex.

68.     By the acts and conduct described above, Morgan Stanley engaged in illegal sex discrimination against Plaintiff in violation of Title VII, through both disparate treatment and disparate impact.

69.     Plaintiff has been harmed as a direct and proximate result of Morgan Stanley's unlawful conduct.

## COUNT V

### RETALIATION IN VIOLATION OF
### TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
### 42 U.S.C. § 2000e-1 *et seq.*

70.     Plaintiff Moore-Bonds realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count V of this Complaint.

71.     Plaintiff Moore-Bonds alleges that she engaged in protected activity by complaining of her unlawful treatment and retaining an attorney.

72.     Plaintiff Moore-Bonds alleges that she suffered retaliation and harm because of her protected activity, in violation of Title VII.

73.     Plaintiff has been harmed as a direct and proximate result of Morgan Stanley's unlawful conduct.

## COUNT VI

### AGE DISCRIMINATION AND RETALIATION
### IN VIOLATION OF ADEA

74.     Plaintiff Moore-Bonds realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count VI of this Complaint.

75.     The ADEA, 29 U.S.C. § 623(a), makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."

76.     The ADEA, 29 U.S.C. § 623(d), also prohibits retaliation against an employee for opposing practices made unlawful under the ADEA.

77.     At all relevant times, Plaintiff was performing her job according to Defendants' reasonable and legitimate job expectations.

78.     Plaintiff engaged in protected activity by, among other things, retaining an attorney and complaining to Defendants about discrimination.

79.     Defendants' termination of Plaintiff, as described above, was an adverse employment action taken because of Plaintiff's age or in retaliation for her protected activity, in violation of the ADEA.

80.     As a direct and proximate result of Defendants' unlawful age discrimination and retaliation alleged in this Complaint, Plaintiff has suffered and continues to suffer damages.

81.     Defendants' violation of the ADEA was a willful violation in that Defendants knew that its conduct violated the ADEA and/or Defendants acted with reckless disregard of the ADEA.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests the entry of judgment in her favor and against Defendants as follows:

a.    Declare that the acts and conduct of Defendants are unlawful and violate 42 U.S.C. § 1981, 42 U.S.C. § 2000e-1 *et seq.,* 29 U.S.C. § 623(a), and 29 U.S.C. § 623(d);

b.    Award Plaintiff the value of all compensation and benefits lost as a result of

Defendants' unlawful conduct;

c.  Award Plaintiff the value of all compensation and benefits she will lose in the future as a result of Defendants' unlawful conduct;

d.  Award Plaintiff compensatory damages, including but not limited to damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

e.  Award Plaintiff punitive damages due to Defendants' malicious conduct and/or their reckless or callous indifference to the statutorily protected rights of Plaintiff;

f.  Award Plaintiff prejudgment interest;

g.  Award Plaintiff attorneys fees, costs, and disbursements; and

h.  Award Plaintiff such other make whole equitable, injunctive, and legal relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Dated: February 19, 2025                    Respectfully Submitted,


                                          */s/ Jennifer S. Gilbert*
                                          *Attorney for the Plaintiff*

Jennifer S. Gilbert
Linda D. Friedman (*pro hac vice* to be requested)
Suzanne E. Bish (*pro hac vice* to be requested)
George S. Robot (*pro hac vice* to be requested)
STOWELL & FRIEDMAN, LTD.
303 W. Madison
Suite 2600
Chicago, Illinois 60606
(312) 431-0888
jgilbert@sfltd.com
lfriedman@slftd.com
sbish@sfltd.com

grobot@slftd.com

Nabeha Shaer
BEN CRUMP LAW, PLLC
633 Pennsylvania Ave NW, Fl. 2
Washington, DC 20004
800-958-1444
nabeha@bencrump.com